UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BOYAN SUBOTIC,

    Plaintiff,

v.                         Case No. 8:21-cv-2137-VMC-SPF

JABIL, INC.,

    Defendant.
_____/

**ORDER**

    This matter comes before the Court upon consideration of Defendant Jabil, Inc.'s Motion for Summary Judgment (Doc. # 26), filed on June 10, 2022. Plaintiff Boyan Subotic responded on July 9, 2022. (Doc. # 30). Jabil replied on July 22, 2022. (Doc. # 31). For the reasons that follow, the Motion is granted.

**I.   Background**

    Subotic was born and lived in Gradiska, Bosnia before moving to the United States when he was 19 years old and considers his ethnicity to be "Serbian." (Doc. # 35 at 6:11-20, 43:6-8, 52:7-21).

    On April 17, 2017, Jabil hired Subotic as a full-time employee in the position of Support Technician II ("Tech II") at Jabil's Defense and Aerospace facility ("JDAS") in

1

St. Petersburg, Florida. (Doc. # 35 at 18:5-7, 34:13-22; Id. at Ex. A-21 at 1).

Subotic considers himself to be a "white Caucasian male." (Id. at 52:22-24). He self-identified as "white, non-Hispanic or Latino" on his employment forms and did not identify himself and/or indicate that he was either from Bosnia or of Serbian national origin. (Id. at 17:2-18:3; Id. at Ex. A-20). The form did not have a space for Subotic to indicate his Serbian ethnicity or national origin.

After becoming employed, Subotic admits that he reviewed and executed Jabil's job description for his Tech II position and received a Jabil Handbook. (Doc. # 35 at 18:8-15, 21:23-25; Id. at Ex. A-21 at 1; Id. at Ex. A-3 at 4).

Subotic admits that he understood that, as part of his job duties for Jabil, he was required to adhere to all Jabil policies and procedures, and that he was to maintain "discretion and confidentiality in all areas pertaining to IT systems" and to "comply and follow all procedures within the company security policy." (Id. at 20:20-21:15; Id. at Ex. A-3 at 2).

2

Jabil's Global Information Security Policy states that:

a.  "This policy applies to full-time employees, part-time employees, temporary workers, and contractors";

b.  "All accounts providing access to Jabil information resources must be unique to each individual and must be used only by the assigned individual or approved by Global Information Security";

c.  "Individuals are accountable for actions associated with their assigned account"; and

d.  "Jabil considers any violation of this policy to be a serious offense and shall constitute an information security violation. Individuals violating the policies shall be subject to disciplinary action, up to and including termination as well as any civil, criminal, or other remedies available at law."

(Doc. # 26-3 at ¶ 23; Id. at Ex. B-6 at 1 (Sections 2.2 and 2.4), at 5 (Sections 6.9.4 – 6.9.5)).

Jabil's Standards of Performance and Conduct ("Code of Conduct") states that:

If an employee violates any company policy or work rule, a supervisor or manager may discuss it with the employee, or the employee may receive a written counseling, documenting the employee's unacceptable performance or behavior. Depending on the severity of the policy violation, an employee may be terminated immediately, or may be placed on a disciplinary suspension.

(Doc. # 26-3 at ¶ 23; Id. at Ex. B-7 at 1).

3

Jabil's Code of Conduct provides a non-exhaustive list of "Examples of Inappropriate Conduct," including among other things:

> a.  "Theft, embezzlement or misuse of company, employee, customer, vendor, supplier, or visitor property or money";
>
> b.  "Harassing or discriminating behavior or any other violation of Jabil's Harassment Policy";
>
> c.  "Deliberately damaging or attempting to damage company, employee, customer, vendor, supplier, or visitor property or money"; and
>
> d.  "Tampering with security equipment."

(Doc. # 26-3 at ¶ 23; Id. at Ex. B-7 at 1-2).

At Jabil, each employee is assigned an individual Jabil computer account ("Jabil account") which, similar to Office 365, contains access to their Jabil email account and other programs the employee needs for their employment at Jabil. (Doc. # 26-4 at ¶ 11). The username for an employee's Jabil account is their 9-digit Jabil employee number. (Id.).

Subotic admits that he understood that he was only allowed to access other employees' Jabil accounts for IT service purposes and only when he was requested to do so by the user or his supervisors. (Doc. # 35 at 22:9-14).

4

As a Tech II, in addition to his regular Jabil account, Subotic had a Jabil administrator account referred to as a "Q1" account, which was account number JABILDAS\Q1 100042918. (Doc. # 26-3 at ¶ 18).

At hire, Subotic's direct supervisor was Site IT Manager Romeo Cooper. (Doc. # 35 at 19:7-13). In November 2019, Andrew Eells was named IT Supervisor and Eells became Subotic's direct supervisor. (Doc. # 26-5 at ¶ 8). Eells, in turn, reported to Cooper at that time. (Doc. # 35 at 19:22-20:19; Doc. # 26-5 at ¶ 8). As his direct supervisor, Eells found Subotic's work as a Tech II to be lacking, believing his skills were closer to a Support Technician I ("Tech I") level. (Doc. # 26-5 at ¶¶ 9-11).

Cooper reviewed Subotic's performance each year he was his supervisor and found that Subotic's performance "meets standards" in 2017 and 2018; however, Cooper found that Subotic's performance declined in 2019, rating him only "partially meets standards" and advised Subotic that he needed to "improve his support skills as a Support Technician II." (Doc. # 35 at 31:11-32:2; Id. at Ex. A-10 at 1-3).

5

Subotic admits that he does not believe he was discriminated against on any basis while working at Jabil in 2017, 2018, or 2019, and that he was not being discriminated against in anyway in 2020 until around two months before July 31, 2020. (Doc. # 35 at 25:15-26:3, 59:2-60:1).

On May 18, 2020, Cooper was demoted from his position as Site IT Manager due to his failure to hold the IT team accountable and Natasha Holton was laterally moved from the position of Quality Manager to the position of Site IT Manager; Eells remained Subotic's direct supervisor, now reporting to Holton. (Doc. # 26-3 at ¶ 4; Doc. # 26-4 at ¶ 6; Doc. # 26-5 at ¶ 8). When Holton was promoted to Site IT Manager, she was tasked with improving the performance of the onsite IT team, including Subotic. (Doc. # 26-3 at ¶ 4; Doc. # 26-4 at ¶ 6).

At Jabil, employees could request onsite IT assistance by (1) submitting an IT ticket, (2) coming to the IT desks to ask a Tech for help, and/or (3) calling the IT desk/Tech for assistance. (Doc. # 35 at 22:16-23:2).

Outside of normal operating hours (5 A.M. to 10 P.M.) and on the weekends, Jabil requires one Tech to perform on-

6

call duty, and this duty is rotated amongst the Tech I and IIs. (Id. at 46:8-47:23). "On call" Support Technicians are compensated for the time spent on call, regardless of whether they handle any calls. (Doc. # 26-4 at ¶ 16; Doc. # 26-5 at ¶ 14). Jabil's expectation is that "on call" Support Technicians will (1) answer the on-call telephone when it rings, (2) immediately begin working on resolving the issue and, (3) depending on the nature and severity of issue, travel to JDAS to resolve the issue if it cannot be resolved remotely. (Doc. # 26-4 at ¶ 16; Doc. # 26-5 at ¶¶ 14-15).

On July 14, 2020, Holton and Eells issued Subotic a verbal warning Positive Discipline Notice for his failure to properly perform his on-call duties on the weekend of July 11-12, 2020, which resulted in two people in the shipping department being sent home because they could not perform work due to being locked out of their computers. (Doc. # 26-4 at ¶¶ 17-20; Doc. # 26-5 at ¶¶ 16-18; Id. at Ex. D-1). Jabil's HR Generalist Jaclyn Mitchell approved the Positive Discipline Notice, prior to Holton and Eells issuing Subotic the Notice on July 14, 2020. (Doc. # 26-4 at ¶¶ 19-20; Doc. # 26-5 at ¶¶ 17-18).

Subotic admits that (1) he did not answer two phone calls from Holton while on-call on July 11, 2020, even though he was aware he was required to answer his phone while on-call, (2) that he did not respond to Holton until three hours after her first call at 11:15 AM, and (3) that his attempt to "resolve" the computer lockout problem by sending an email to these employees was a futile act because the employees "probably [could] not" access the email he sent if they were locked out of their computer. (Doc. # 35 at 38:9-39:20, 40:20-41:4).

Jabil also had an onsite IT phone that Techs must always carry, and there was an agreed schedule between the Techs for carrying the onsite phone. (Doc. # 35 at 44:8-15, 45:25-46:21; Doc. # 26-4 at ¶¶ 14, 23; Doc. # 26-5 at ¶¶ 6, 20). On July 21, 2020, Holton and Eells issued Subotic a written warning Positive Discipline Notice for his failure to carry the onsite phone when he was the morning shift Tech. (Doc. # 26-4 at ¶¶ 22-25; Doc. # 26-5 at ¶¶ 19-22; Id. at Ex. D-2). Subotic's co-worker, Support Technician I Scott Marsala, saw that Subotic was not carrying the onsite phone and reported the violation to Eells that same morning. Eells then told Holton. (Doc. # 26-5 at ¶¶ 19-21).

HR Generalist Mitchell again approved the Positive Discipline Notice, prior to Holton and Eells issuing Subotic the Notice on July 21, 2020. (Doc. # 26-4 at ¶¶ 24-25; Doc. # 26-5 at ¶¶ 21-22). Subotic does not recall if he was carrying the onsite phone on July 20, 2020 and did not make any objection(s) on the Positive Discipline Notice. (Doc. # 35 at 44:5-7; Doc. # 26-5 at Ex. D-2). Although Subotic later told HR Manager II Deanna Doheny that Marsala also failed to carry the onsite phone as required, Doheny noted that Subotic had not reported Marsala when Marsala failed to carry the onsite phone and Subotic "had no proof" that Marsala did not carry the onsite phone. (Doc. # 26-3 at B-4 at 1). Doheny also knew that Marsala and certain other IT employees, but not Subotic, would forward calls to the onsite phone to their regular phone so that they would not need to physically carry the onsite phone. (Id. at B-4 at 1; Doc. # 29-2 at 136:15-137:4). Indeed, Doheny testified that she did not know of anyone who was established to have failed to carry the onsite phone and was not disciplined for that failure. (Doc. # 29-2 at 137:5-8).

At 5:31 AM on Friday, July 31, 2020, Subotic sent an email to Doheny, with copies to Eells and Holton, alleging discrimination based upon his "national origin as being of a Serbian ethnicity" against his "manager." (Doc. # 35 at 54:22-55:4; Id. at Ex. A-22).

Doheny immediately began an investigation and met with Subotic the same day to get more information about his claims, which were allegations that Holton was discriminating against him by writing him up when she was not disciplining other Techs for similar infractions. (Doc. # 26-3 at ¶¶ 6-7, 16; Id. at Ex. B-4 at 1). Subotic admitted to Doheny that his supervisors (Holton and Eells) never made any negative comments about his Serbian ethnicity. (Id. at ¶ 7). The only comment Subotic reported that related to his national origin was that his co-worker, Support Technician I Scott Marsala, had stated he did not want to try the food that Subotic had brought for lunch because he did not like "ethnic" food. (Id.). Marsala, as a co-worker of Subotic's, had no power to discipline Subotic. (Doc. # 29-2 at 87:1-4).

Subotic admits that when he reported Holton for discrimination, he was unaware if Holton was disciplining

10

or writing up other Techs for similar infractions but considered Holton's actions to be discriminatory because he had not been written up in a similar manner by Cooper. (Doc. # 35 at 53:19-54:4, 55:21-56:10, 58:12-20, 60:20-61:5). Subotic admits that he is unaware if Holton knew his national origin was Serbian. (Id. at 27:16-28:4, 30:12-18, 43:6-9, 54:5-8). Holton was unaware of Subotic's national origin prior to the July 31, 2020, email wherein he identified himself as "Serbian." (Doc. # 26-4 at ¶ 29). Eells did know that Subotic was Serbian. (Doc. # 29-4 at 24:25-25:5).

On Monday, August 3, 2020, Doheny interviewed Holton. (Doc. # 26-3 at ¶ 9; Doc. # 26-4 at ¶ 30). Holton denied discriminating against Subotic for any reason and advised Doheny that in July 2020 Holton and Eells had jointly issued Subotic a verbal warning and written warning for his failure to perform his on-call duties, including his failure to carry the onsite phone. Holton also told Doheny that Mitchell in HR had reviewed and approved each disciplinary warning for Subotic. (Doc. # 26-3 at ¶ 9; Doc. # 26-4 at ¶ 30).

11

Holton advised Doheny that she and Eells had disciplined other employees for similar job performance issues, including (1) Tech II Manny Freitas, who was issued a verbal warning on June 1, 2020, a written warning on June 29, 2020, a final written warning on July 17, 2020, and then terminated on July 28, 2020, for his repeated job performance issues and (2) a counseling session she and Eells held with Tech I Marsala regarding complaints about his teamwork from other Techs, including Subotic. (Doc. # 26-3 at ¶¶ 10-11; Doc. # 26-4 at ¶¶ 31-32; Doc. # 26-4 at Exs. C-4, C-5, and C-6).

Holton also advised Doheny that in mid-July 2020 she had begun investigating a complaint made by Master Planner Tatianna Lane that she was locked out of her Jabil account because of failed login attempts from Subotic's Jabil desktop. (Doc. # 26-3 at ¶ 12; Doc. # 26-4 at ¶ 33).

On August 5, 2020, Doheny interviewed Lane, who reported experiencing ongoing issues with being locked out of her Jabil account. (Doc. # 26-3 at ¶¶ 14, 22; Id. at Ex. B-5 at 1). Lane received an error message stating she had too many failed login attempts, even though she had not

personally had any failed attempts to login prior to the lockout. (Id. at ¶¶ 14, 22; Id. at Ex. B-5 at 1).

Lane reported that in early July 2020, she asked Tech Marsala to explore why she was locked out of her Jabil account due to unsuccessful login attempts after only briefly stepping away from her desk, and that Marsala advised her that she was locked due to unsuccessful login attempts from Subotic's Jabil desktop. (Id. at ¶¶ 14, 22; Id. at Ex. B-5 at 1).

Lane also reported to Doheny that Subotic's behavior towards her had been concerning since December 2018 when he (1) touched her inappropriately without her consent after the Jabil holiday party, (2) subsequently told her he had "feelings" for her in or around January/February 2019, and (3) made unwelcome advances toward her, including showing up at her home uninvited on two occasions. (Id. at ¶¶ 14, 22; Id. at Ex. B-5 at 1).

HR Manager Doheny, with the assistance of Site IT Manager Holton and IT Architect Rob Ingenthron, reviewed reports from the various Jabil computer systems and programs, which showed that: (1) Subotic's Jabil assigned computer attempted to login to Lane's Jabil account using

her Jabil employee number username (100063684) on March 30, 2020, April 17, 2020, May 26, 2020, and on July 2, 2020; (2) that on two other occasions, March 30, 2020 and April 17, 2020, Subotic's administrator account (JABILDAS\Q1_100042918) had disabled Ms. Lane's computer; and (3) that Ms. Lane had not submitted any IT tickets for service on these dates. (Doc. # 26-3 at ¶¶ 18-19, 22; Id. at Ex. B-3 at 1-3; Id. at Ex. B-5 at 1; Doc. # 26-4 at ¶¶ 27, 34-35).

For the July 2, 2020 attempt, Doheny also reviewed video of the IT area and found that one man was in Subotic's cubicle at Subotic's Jabil assigned computer at the time the attempted access of Lane's account occurred. (Doc. # 26-3 at ¶ 20). According to her affidavit, Doheny believed this man was Subotic. (Id.). During her deposition, Doheny testified that she did not see anyone except Subotic entering his cubicle on that video. (Doc. # 29-2 at 104:4-9). Still, she admitted that she has "no actual physical evidence that the person sitting behind [] Subotic's computer was actually [] Subotic." (Id. at 216:23-217:6).

On or about August 12, 2020, HR Manager Doheny provided Subotic with her investigative findings regarding his complaint of discrimination against Holton. (Doc. # 26-3 at ¶ 16). Doheny advised Subotic that his suspicion that Holton was not disciplining other Techs for violations of rules, policies or job performance failures was incorrect, and that there was no evidence that Holton was treating him differently due to his Serbian national origin or ethnicity. (Doc. # 26-3 at ¶ 16; Id. at Ex. B-4 at 1-2). Subotic advised Doheny that he did not have any other concerns he wanted her to investigate, so Doheny informed him the investigation was closed. (Id. at ¶ 16, Id. at Ex. B-4 at 1-2).

On August 14, 2020, Doheny interviewed Subotic regarding Lane's allegations that he locked her out of her Jabil account because of too many unsuccessful login attempts. (Doc. # 26-3 at ¶ 21). While Doheny understood that she was investigating the events regarding Lane's computer lockout, Doheny never mentioned Lane by name specifically during her conversation with Subotic. (Doc. # 29-2 at 212:15-22). She chose not to mention Lane by name out of concern for Lane. (Id. at 207:2-17).

15

Subotic claimed that he had locked himself out of his Jabil account, so he created a fake username and used a "random" employee identification number to try to gain access. However, Subotic could not offer any explanation as to (1) why he had repeatedly used the same "random" employee identification number belonging to Lane; (2) why these "random" attempts after he had a "lockout" occurred on multiple different dates; or (3) why he had administratively disabled Lane's computer on two occasions. (Doc. # 26-3 at ¶¶ 21-22; Id. at Ex. B-5 at 1). In fact, Subotic failed to provide any legitimate reason for attempting to access Lane's Jabil account when she had not submitted an IT ticket or asked for his assistance. (Id. at ¶¶ 21-22; Id. at Ex. B-5 at 1).

Doheny determined Subotic had committed a serious violation of Jabil's Security Policy and Code of Conduct by trying to access Lane's Jabil account and disabling her computer without authorization and recommended that his employment be terminated. (Doc. # 26-3 at ¶¶ 22-24; Id. at Ex. B-5 at 1). Doheny advised Jabil's Director of Operations, Ron Anderson, and Holton of her recommendation to terminate Subotic's employment for his breach of Jabil's

policies, and they agreed with the recommendation. (Doc. # 26-3 at ¶ 24; Doc. # 26-4 at ¶ 39; Doc. # 26-6 at ¶¶ 6-8).

On August 18, 2020, Anderson and Doheny met with Subotic via Microsoft Teams and advised him that his employment with Jabil was being terminated due to his violation of Jabil policies. (Doc. # 35 at 61:15-62:12; Doc. # 26-3 at ¶ 25). The meeting occurred via Microsoft Teams because Subotic was on paid COVID-19 leave since August 3, 2020, when he reported having symptoms. (Doc. # 26-3 at ¶¶ 8, 25). At no point during this meeting did Subotic raise the issue of national origin discrimination or claim that he was being terminated in retaliation for his complaint of national origin discrimination. (Id. at ¶ 25).

Two other attempts to access Lane's account were made from computers besides Lane's: once from a computer assigned to employee Duy Huynh and once from a computer assigned to employee Nangellie Sanlnocencio. (Doc. # 26-3 at ¶ 17; Doc. # 29-3 at 130:1-132:1). Doheny investigated this login attempt and determined that Lane was responsible for the attempts to login to "the Jabil computers assigned to employees [] Huynh and [] Sanincencio, as the multiple

17

Jabil computers assigned to these two employees sat in JDAS conference rooms and on the JDAS floor, respectively, and were used by numerous employees including [] Lane." (Doc. # 26-3 at ¶ 17). Likewise, Holton testified that the computer in Duy's name was a conference room computer that Lane had likely tried to use herself and Lane "thought she had logged in" on Sanlnocencio's computer once. (Doc. # 29-3 at 131:17-132:1). In contrast, "Lane denied ever making any attempts to login to her Jabil account from [] Subotic's Jabil assigned computer." (Doc. # 26-3 at ¶ 17).

On the same day that Subotic was terminated, August 18, 2020, Holton and Eells issued Tech I Eric Flynn a verbal warning Positive Discipline Notice for his failure to carry the on-call phone when he was the Tech designated as on-call for the week of August 10-17, 2020. (Doc. # 26-4 at ¶¶ 36-38; Id. at Ex. C-8; Doc. # 26-5 at ¶ 23).

Subotic initiated this action on September 7, 2021, asserting the following claims: Title VII National Origin Discrimination (Count I); 42 U.S.C. § 1981 National Origin Discrimination (Count II); Florida Civil Rights Act ("FCRA") National Origin Discrimination (Count III); Title VII Retaliation (Count IV); 42 U.S.C. § 1981 Retaliation

18

(Count V); FCRA Retaliation (Count VI); and Florida Whistleblower Act ("FWA") Retaliation (Count VII). (Doc. # 1). Jabil now moves for summary judgment on all claims. (Doc. # 26). The Motion is fully briefed (Doc. ## 30, 31), and ripe for review.

**II.** **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial

burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

"When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the Court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir.

1988).  But,  if  the  non-movant's  response  consists  of
nothing  "more  than  a  repetition  of  his  conclusional
allegations,"  summary  judgment  is  not  only  proper,  but
required.  Morris v. Ross,  663  F.2d  1032,  1034  (11th  Cir.
1981).

## III. <u>Analysis</u>

Jabil  seeks  summary  judgment  on  all  of  Subotic's
claims.  Jabil  also  highlights  multiple  issues  with
Subotic's  response.  Indeed,  Subotic's  response  to  the
Motion  was  untimely,  having  been  filed  in  the  early  hours
of  July  9  rather  than  the  July  8  deadline.  (Doc.  #  30).  In
an  abundance  of  fairness,  the  Court  declines  to  strike  the
response  as  untimely.

Additionally,  Subotic  failed  to  properly  dispute
certain  of  Jabil's  statements  of  material  fact  because
Subotic  did  not  cite  any  record  evidence  in  support  of  such
dispute  —  a  requirement  the  Court  explained  in  its  order
regarding  summary  judgment  briefing.  See  (Doc.  #  17  at  2)
("Each  denial  must  set  forth  a  pinpoint  citation  to  the
record  where  the  fact  is  disputed. . . .  In  deciding  a
motion  for  summary  judgment,  the  Court  will  deem  admitted
any  fact  in  the  statement  of  material  facts  that  the

21

opposing party does not specifically controvert, provided record evidence supports the moving party's statement."). Subotic also fails to properly cite deposition testimony, as he does not cite line designations as required. See (Id. at 1-2) ("[A] reference to 'Deposition of Jones' is insufficient; the page and **line number** of the deposition transcript must be included." (emphasis added)).

Thus, the Court will consider any statement of material fact that Subotic has failed to properly dispute as admitted and will not credit Subotic's statements of additional material facts that are not supported by a proper citation to record evidence. Additionally, to the extent Subotic includes references to evidence not in his statement of additional material facts in the body of his response (such as footnotes referencing Wikipedia articles), the Court disregards those references and does not consider them record evidence. See (Id. at 3) ("Additional facts the party opposing summary judgment contends are material shall be numbered and placed at the end of the opposing party's response [to the moving party's statement of material facts] and include a pinpoint citation to the record where the fact is established.").

The Court now turns to the merits of the claims.

**A.    Retaliation Claims under Title VII, FCRA, and FWA**

Title VII prohibits employers from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge . . . under [Title VII]." 42 U.S.C. § 2000e-3(a); see also Vickers v. Fed. Express Corp., 132 F. Supp. 2d 1371, 1378 (S.D. Fla. 2000) ("[T]he analysis under Title VII applies when considering claims under the Florida Civil Rights Act, because the Florida act was patterned after Title VII."); Graddy v. Wal-Mart Stores E., LP, 237 F. Supp. 3d 1223, 1226 n.5 (M.D. Fla. 2017) ("The McDonnell-Douglas burden-shifting paradigm . . . applies to FWA claims." (citing Sierminski v. Transouth Fin. Corp., 216 F.3d 945, 950 (11th Cir. 2000))). "A Title VII retaliation claim based on circumstantial evidence, like the claim asserted by [Subotic] here, is ordinarily analyzed under the McDonnell Douglas burden-shifting framework." Tolar v. Bradley Arant Boult Commings, LLP, 997 F.3d 1280, 1289 (11th Cir. 2021).

"Pursuant to that framework, the plaintiff first must establish a prima facie case of retaliation by showing

that: (1) [he] engaged in statutorily protected conduct —
that is, conduct protected by Title VII; (2) [he] suffered
an adverse action; and (3) 'there is some causal
relationship between the two events.'" Id. (citation
omitted). "The burden then shifts to the employer to
articulate a legitimate, nonretaliatory reason for the
adverse action." Id. "Assuming the employer's burden is
met, 'the burden shifts back to the plaintiff to establish
that the reason offered by the [employer] was not the real
basis for the decision, but a pretext' for retaliation."
Id. (citation omitted).

The Court will assume, without deciding, that Subotic
has established a prima facie case of retaliation under
Title VII and the FWA with his July 31, 2020, email being
his protected activity and his termination being a
materially adverse employment action.

However, these claims fail because Subotic has not
shown a genuine dispute of material fact regarding pretext.
"[T]o establish pretext at the summary judgment stage, a
plaintiff must demonstrate such weaknesses,
implausibilities, inconsistencies, incoherencies, or
contradictions in the employer's proffered legitimate

reasons for its action that a reasonable factfinder could find them unworthy of credence." Gogel v. Kia Motors Mfg. of Georgia, Inc., 967 F.3d 1121, 1136 (11th Cir. 2020) (citation and internal quotation marks omitted). "[A] reason is not pretext for [retaliation] unless it is shown *both* that the reason was false, *and* that [retaliation] was the real reason." Id. (citation and internal quotation marks omitted). "[W]hen assessing whether an employer has properly imposed an adverse action on an employee based on that employee's conduct, the question is not whether the employee actually engaged in the conduct, but instead whether the employer in good faith believed that the employee had done so." Id. at 1148.

Subotic has failed to rebut Jabil's legitimate, non-discriminatory reason for his termination. Again, Lane complained to Holton that Subotic was attempting to log in to her account, and analysis of Jabil's computer system revealed that to be true. Subotic had attempted to log in to her account four times and had disabled her computer twice, all without Lane submitting any IT ticket requesting service. (Doc. # 26-3 at ¶¶ 18-19, 22). Jabil did not credit Subotic's explanations regarding login attempts and

Subotic did not provide an excuse for the times he disabled Lane's computer. (Id. at ¶¶ 21-22).

While Subotic debates the video's ability to establish identity, there is no evidence to dispute that Jabil had video that it believed showed Subotic alone sitting at his cubicle while one of the unauthorized login attempts was made from Subotic's computer. Likewise, Lane's description of other alleged inappropriate conduct by Subotic, including his showing up uninvited at her home more than once, understandably bolstered Jabil's belief that Subotic was responsible for attempting to access and disabling Lane's computer. In short, regardless of whether Subotic had made the login attempts or whether he did so intentionally, Jabil had a good faith belief that Subotic had intentionally attempted to login to Lane's account without authorization. See Alvarez v. Royal Atl. Devs., Inc., 610 F.3d 1253, 1266 (11th Cir. 2010) ("The question is not whether it really was Alvarez's fault that assignments were not completed on time, or whether she did delegate excessively, or whether she was aggressive and rude to her colleagues and superiors, or whether she actually lost an important document or truly did fall

26

asleep at her desk. The question is whether her employers were dissatisfied with her for these or other non-discriminatory reasons, even if mistakenly or unfairly so, or instead merely used those complaints about Alvarez as cover for discriminating against her because of her Cuban origin.").

Instead of rebutting this evidence, Subotic argues that, even if he did disable Lane's computer and make the numerous unauthorized login attempts, such conduct was not a violation of Jabil's Security Policy. According to Subotic, the Security Policy only "prohibit[ed] unauthorized access to another individual's account," but Subotic "did not ever actually access Lane's account" despite his attempts to do so. (Doc. # 30 at 18). Essentially, he maintains that his frequent but unsuccessful attempts to violate Jabil's Security Policy are insufficient grounds for Jabil to take disciplinary action against him under the Security Policy.

This is unpersuasive because Jabil had a good faith belief that Subotic's conduct was improper under the Code of Conduct and Security Policy. See Gogel, 967 F.3d at 1149 (explaining that, to determine pretext, what matters is

"what the employer in good faith believes the employee to have done, not whether the employee actually engaged in the particular conduct"). Notably, Subotic testified that he knew he could not access the accounts of other Jabil employees unless he was requested to do so. (Doc. # 35 at 22:9-14). It also appears that Subotic's use of his administrator account to disable Lane's account successfully twice without permission was a violation of the Code of Conduct, which listed "misuse of company . . . property" as an example of inappropriate conduct. (Doc. # 26-3 at Ex. B-7 at 1-2). Even if his conduct did not constitute technical violations of the specific provisions of the Security Policy and Code of Conduct on which Jabil relied, the Code of Conduct makes clear that its list of inappropriate conduct is non-exhaustive. (Doc. # 26-3 at Ex. B-7 at 1-2).

Finally, the temporal proximity between Subotic's email regarding discrimination and his termination is insufficient to create a genuine dispute over pretext. True, Subotic's termination on August 18, 2020, was only a bit over two weeks after his July 31 email complaining about discrimination. But "close temporal proximity between

two events, standing alone, is not a panacea, absent any other evidence that the employment decision was causally related to the protected activity." Hankins v. AirTran Airways, Inc., 237 F. App'x 513, 520-23 (11th Cir. 2007) (holding that plaintiff failed to show a genuine dispute as to causation or pretext for the allegedly retaliatory termination where plaintiff threatened violence against a co-worker — an "intervening act of misconduct" — five days after reporting suspected racial discrimination); see also Henderson v. FedEx Express, 442 F. App'x 502, 506 (11th Cir. 2011) ("Intervening acts of misconduct can break any causal link between the protected conduct and the adverse employment action.").

Here, Holton averred that Lane complained to her about Subotic's attempted unauthorized logins in mid-July 2020 (Doc. # 26-4 at ¶¶ 26-27) — before Subotic sent his July 31 email complaining about alleged discrimination to Doheny. Additionally, in the days following Subotic's email complaint, the investigation into the unauthorized login attempts revealed that Subotic was responsible for this misconduct. While Subotic considers it suspicious that Holton did not relay Lane's complaint to Doheny until after

Subotic had complained about Holton, Subotic is merely speculating that the investigation regarding Lane's computer escalated because of his email complaint. Indeed, the computer records of Subotic's unauthorized login attempts for Lane's account — all of which predate Subotic's complaint — would prevent any reasonable jury from concluding that Holton fabricated Lane's earlier complaint about Subotic or that the investigation regarding the unauthorized login attempts was a sham.

Because he has failed to show a genuine dispute as to pretext, summary judgment is granted on Subotic's claims for retaliation under Title VII, the FCRA, and the FWA.

> **B.    Discrimination Claims under Title VII and FCRA**

"[D]iscrimination claims can be categorized as either single-motive or mixed-motive 'claims.'" _Williams v. Fla. Atl. Univ._, No. 15-60621-CIV, 2017 WL 1881676, at *4 (S.D. Fla. May 9, 2017) (quoting _Quigg v. Thomas Cnty. Sch. Dist._, 814 F.3d 1227, 1235 (11th Cir. 2016)), _aff'd_, 728 F. App'x 996 (11th Cir. 2018). "A single-motive, or 'pretext,' case is one where an illegitimate reason, such as race or gender, was the sole motivation for the adverse employment decision." _Id._ "A mixed-motive case is one where both

30

legitimate and illegitimate reasons motivated the employer's adverse employment decision." Id. "Mixed-motive and single-motive discrimination are not 'distinct causes of action' but rather 'serve as alternative causation standards for proving discrimination.'" Id. (quoting Quigg, 814 F.3d at 1235 n.4).

Jabil's Motion seeks summary judgment on Subotic's Title VII and FCRA national origin discrimination claims under the single-motive theory, which utilizes the McDonnell Douglas burden-shifting framework. (Doc. # 26 at 11-15). But Subotic argues in his response that his claims should survive under the mixed-motive theory of discrimination, for which the McDonnell Douglas framework does not apply. (Doc. # 30 at 10-11). Indeed, Subotic alleged in his complaint that his "national origin was, at minimum, a motivating factor" in Jabil's decision to take adverse actions against him, including the two disciplinary actions in July 2020 and his termination in August 2020. (Doc. # 1 at 6).[1]

_____

[1] Regardless, Jabil is incorrect that a plaintiff must allege the mixed-motive theory of discrimination in his complaint. See Williams v. Fla. Atl. Univ., 728 F. App'x 996, 999 (11th Cir. 2018) ("Williams argues that the

Because his response only discusses the mixed-motive theory of discrimination, Subotic has waived any argument that his claims should survive summary judgment under the McDonnell Douglas framework. See Edmondson v. Bd. of Trustees of Univ. of Ala., 258 F. App'x 250, 253 (11th Cir. 2007) ("In opposing a motion for summary judgment, a party may not rely on her pleadings to avoid judgment against her. There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); Powell v. Am. Remediation & Envtl., Inc., 61 F. Supp. 3d 1244, 1253 n.9 (S.D. Ala. 2014) ("[W]here the non-moving party fails to address a particular claim asserted in the summary judgment motion but has responded to other claims made by the movant, the

district court erred in determining her mixed-motive claims were untimely. She is right. A plaintiff is not required to label[ ] [her case] as either a 'pretext' case or a 'mixed-motives' case from the beginning in the District Court. . . . Williams was only required to argue that her case involved mixed-motives [a]t some point in the proceedings, which she did in opposition to the defendants' motion for summary judgment." (citation and internal quotation marks omitted)).

district court may properly consider the non-movant's default as intentional and therefore consider the claim abandoned."), aff'd, 618 F. App'x 974 (11th Cir. 2015).

Thus, the Court need only address the mixed-motive theory. Under the particular circumstances of this case, the Court finds that Jabil has not waived the argument that Subotic failed to establish a genuine dispute of material fact under the mixed-motive theory of discrimination. While the complaint used the phrase "motivating factor," Jabil explains that Subotic's actual theory propounded during discovery was that the sole reason for his termination was discrimination and retaliation. (Doc. # 31 at 2-3). Subotic testified that discrimination and retaliation were the real — and only — reasons for his termination. (Doc. # 35 at 82:20-83:14, 92:23-93:21). That is, Subotic did not maintain during his deposition that he was terminated in part based on Jabil's stated reasons for his termination and in part based on discrimination.

Importantly, once Subotic argued the motivating factor theory in his response to the Motion, Jabil addressed the motivating factor analysis on the merits in its reply. See Vargas v. Michaels Stores, Inc., No. 8:16-cv-1949-VMC-JSS,

2017 WL 3174058, at *2 (M.D. Fla. July 26, 2017) (explaining that district courts may properly consider new arguments raised in reply briefs "if they address unexpected issues raised for the first time by the opposing party's response"). Thus, while it would have been better for Jabil to address the mixed-motive theory in its Motion, the Court will address the mixed-motive analysis on the merits.

"An employee can succeed on a mixed-motive claim by showing that illegal bias, such as bias based on sex or gender, 'was a motivating factor for' an adverse employment action, 'even though other factors also motivated' the action." Quigg, 814 F.3d at 1235 (11th Cir. 2016) (citation omitted). The mixed-motive "framework requires a court to ask only whether a plaintiff has offered 'evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was a motivating factor for the defendant's adverse employment action.'" Id. at 1239 (citation omitted). "In other words, the court must determine whether the 'plaintiff has presented sufficient evidence for a reasonable jury to conclude, by a

preponderance of the evidence, that [her protected characteristic] was a motivating factor for [an] adverse employment decision.'" Id. (citation omitted).

Even under the more lenient mixed-motive analysis, Subotic has failed to show a genuine issue of material fact regarding discrimination. True, Subotic was never disciplined while working under his former-supervisor Cooper. But this means little given the undisputed evidence that Cooper was demoted, and Holton was moved into Cooper's former position in order to improve the performance of the onsite IT team. (Doc. # 26-3 at ¶ 4; Doc. # 26-4 at ¶ 6).

There is no evidence that Holton — the primary person Subotic accuses of discrimination — knew of Subotic's Serbian national origin or ethnicity at the time she began issuing him discipline. And Subotic does not deny that he failed to perform his on-call duties or carry the onsite phone as required — the basis for the discipline he received in July 2020. (Doc. # 35 at 38:9-39:20, 40:20-41:4, 44:5-7; Doc. # 26-3 at B-4). While Subotic argues that Marsala had also failed to carry the onsite phone on one occasion, he did not report this to his supervisors at the time, unlike Marsala who promptly reported Subotic's

failure to carry the onsite phone. (Doc. # 26-3 at Ex. B-4 at 1). This, along with the fact that Marsala forwarded calls from the onsite phone to his personal phone, explains why Jabil did not discipline Marsala for the alleged violation. (Id.).

Furthermore, other Jabil technicians, who were not Serbian, were disciplined for similar performance issues. Holton and Eells issued Tech I Eric Flynn a verbal warning Positive Discipline Notice for his failure to carry the on-call phone when he was the Tech designated as on-call for the week of August 10-17, 2020. (Doc. # 26-4 at ¶¶ 36-38; Id. at Ex. C-8; Doc. # 26-5 at ¶ 23). They also progressively disciplined Tech II Manny Freitas, who was issued a verbal warning on June 1, 2020, a written warning on June 29, 2020, a final written warning on July 17, 2020, and then terminated on July 28, 2020, for his repeated job performance issues. (Doc. # 26-3 at ¶ 10; Doc. # 26-4 at ¶ 31). Marsala also received a counseling based on co-workers' complaints about his teamwork. (Doc. # 26-3 at ¶ 11; Doc. # 26-4 at ¶ 32).

Notably, even after they learned of Subotic's Serbian heritage, no one involved in the decision to terminate

36

Subotic made any comments regarding Subotic's national origin or ethnicity. At most, Subotic's co-worker Marsala, who did not make the decision to discipline or terminate him, once declined to try food Subotic had brought in to share because Marsala disliked "ethnic" food. In this instance, Marsala's single statement, for which there is no evidence that Subotic's supervisors were aware, does not create a genuine dispute about Subotic's supervisors having any discriminatory animus towards him. See Burton v. Gwinnett Cnty. Sch. Dist., No. 116CV03775LMMWEJ, 2017 WL 11496778, at *11 (N.D. Ga. Oct. 31, 2017) ("Dr. Camp's comments are so far removed from Superintendent Wilbanks's decision they border on being immaterial. Thus, plaintiff rests her mixed-motive theory almost entirely on one vague comment — a comment made after the District reached its final decision and made by someone without final decision-making authority acting under her supervisor's directive and in accordance with District policy. While plaintiff's burden in providing evidence sufficient to survive summary judgment on a mixed-motive theory is light, she has failed to carry that burden here."), report and recommendation adopted, No. 116CV03775LMMWEJ, 2018 WL

37

10398907 (N.D. Ga. Feb. 7, 2018), <u>aff'd</u>, 756 F. App'x 926 (11th Cir. 2018).

Likewise, regarding Subotic's termination, there is no evidence that any other employee made an unauthorized attempt to log in to Lane's account. While login attempts were recorded from computers assigned to two other Jabil employees, Doheny's investigation revealed that Lane herself had attempted to login to her account from those computers. (Doc. # 26-3 at ¶ 17). Furthermore, no other employee has been shown to have disabled another person's account without permission and not been punished for that conduct.

In short, there is insufficient circumstantial evidence in the record for a reasonable jury to conclude that Subotic's being Serbian was a motivating factor in his two disciplinary warnings or his termination. Summary Judgment is granted to Jabil on Counts I and III.

### C. <u>Section 1981 Claims</u>

Finally, Subotic's Section 1981 claims fail because they are based only on his national origin. "All persons . . . shall have the right . . . to make and enforce contracts, to sue, be parties, give evidence, and to the

full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a). "By its very terms, § 1981 applies to claims of discrimination based on race, not national origin." Tippie v. Spacelabs Med., Inc., 180 F. App'x 51, 56 (11th Cir. 2006); see also Bedoya v. Hilti, Inc., No. 03-60327-CIV-COOKE, 2004 WL 2857477, at *3 (S.D. Fla. Nov. 24, 2004) ("Although Bedoya may bring a claim of discrimination based on ethnicity and ancestry, a claim of discrimination based solely on the place or nation of origin is insufficient under 42 U.S.C. § 1981."), aff'd, 159 F. App'x 91 (11th Cir. 2005).

Faced with Jabil's Motion, Subotic now claims that his Section 1981 claims are based on his Serbian ethnicity, not his Serbian national origin. (Doc. # 30 at 7); see also Saint Francis College v. Al-Khazraji, 481 U.S. 604, 614 (1987) (Brennan, J., concurring) ("[T]he line between discrimination based on ancestry or ethnic characteristics, and discrimination based on place or nation of origin, is not a bright one." (internal citations and quotations omitted)). But this argument is disingenuous. Neither the word "race" nor "ethnicity" appear anywhere in Subotic's

complaint. (Doc. # 1). Rather, the title of Subotic's Section 1981 discrimination claims reads as follows: "COUNT II (42 U.S.C. § 1981 NATIONAL ORIGIN DISCRIMINATION)." (<u>Id.</u> at 7). Indeed, Subotic alleged that he "is in a protected class within the meaning of 42 U.S.C. § 1981 by virtue of his national origin, Serbian." (<u>Id.</u>). In his Section 1981 retaliation claim, he alleged that his protected activity was reporting "national origin-based discrimination." (<u>Id.</u> at 12).

Subotic is represented by counsel who could have researched the law on Section 1981 before filing the complaint or timely filed a motion to amend the complaint to state Section 1981 claims based on ethnicity. But Subotic did not do so. Subotic explicitly and exclusively premised his Section 1981 claims in his complaint on national origin — not race or ethnicity. <u>See</u> <u>Batton v. Tarmac Am., LLC.</u>, No. 05-21707-CIV, 2005 WL 8155174, at *4 (S.D. Fla. Nov. 22, 2005) ("Batton's characterization of his national origin is irrelevant because section 1981 *does not recognize claims based exclusively on national origin.* Indeed, although courts have often found the concepts of 'race' and 'national origin'

to be indistinguishable, no single case has been identified where a court recognized a section 1981 claim notwithstanding the fact that a plaintiff *explicitly, and exclusively,* pled the claim as one based upon national origin discrimination.").

Now he is stuck with that decision, as it is well-established that "a plaintiff cannot amend his complaint through argument made in his brief in opposition to the defendant's motion for summary judgment." <u>Miccosukee Tribe of Indians of Fla. v. United States</u>, 716 F.3d 535, 559 (11th Cir. 2013); <u>see also</u> <u>Henderson v. McMurray</u>, No. 5:19-CV-00436-AKK, 2020 WL 554230, at *4 (N.D. Ala. Feb. 4, 2020) ("[A] plaintiff cannot amend a complaint through arguments in briefs."), <u>aff'd</u>, 987 F.3d 997 (11th Cir. 2021).

Even if the Section 1981 claims were properly premised on ethnicity, these claims would still fail for the reasons discussed in depth by the Court as to Subotic's other claims. That is, Subotic cannot demonstrate a genuine dispute as to pretext for the Section 1981 retaliation claim. He also cannot demonstrate a genuine dispute as to

41

whether his ethnicity was a motivating factor for any adverse employment action.

Summary judgment is granted on Subotic's Section 1981 discrimination and retaliation claims, Counts II and V.

Accordingly, it is now

**ORDERED**, **ADJUDGED**, and **DECREED:**

(1) Defendant Jabil, Inc.'s Motion for Summary Judgment (Doc. # 26) is **GRANTED.**

(2) Summary judgment is granted in favor of Jabil on all counts of the complaint.

(3) The Clerk is directed to enter judgment accordingly and, thereafter, **CLOSE** the case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 18th day of October, 2022.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE